# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

RICKY THOMAS, JR.,

        Plaintiff,

vs.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

        Defendant.

No. 20-CV-2088-LTS-KEM

**REPORT AND RECOMMENDATION**

---

Plaintiff Ricky Thomas Jr. seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383(f). Thomas argues that the administrative law judge (ALJ), Michael Lee Larner, violated the law-of-the-case doctrine by formulating a less restrictive residual functional capacity (RFC) than a prior ALJ whose opinion was previously reversed by this court. Thomas also argues that the ALJ should have fully credited his subjective complaints and obtained additional medical-opinion evidence. I recommend **affirming** the Commissioner's decision.

## I.  BACKGROUND[1]

Thomas, born in 1977, worked full-time for ten years at a school as a paraeducator. AR 221-23, 232, 3713. He reported he was fired in March 2008 after a

---

[1] For a more thorough overview of the treatment records after 2017, see the Joint Statement of Facts (Doc. 22).

new principal began working at the school who disliked and bullied him. *Id.* He found new full-time employment in August 2008 as a credit manager and delivery driver for a furniture rental company. AR 232. His problems began in early January 2009, when while driving for work, his car went off the road and flipped onto its side during an ice storm. AR 673, 676, 3711. After the accident, Thomas reported back, neck, and shoulder pain, and he attended physical therapy. AR 674-75. A doctor initially imposed work restrictions, but within a month of the accident, Thomas resumed normal duties (which required sitting longer periods to drive and lifting more than fifty pounds). *Id.* Thomas reported that he was fired in November 2009 because "he did not seem happy . . . working there." AR 207, 209, 223, 231-32, 674, 2549, 3013-14, 3713.[2] Thomas has not worked since, other than working a few hours a week as a counselor during the summer of 2010. AR 46, 232, 2914.

At some point, Thomas filed a claim for workers' compensation based on the injuries he sustained in the car accident. *See* AR 46, 232, 673, 2914. In connection with that claim, he attended a consultative examination with Arnold Delbridge, MD, in September 2010. AR 673-77. Dr. Delbridge noted that Thomas's shoulder pain had resolved shortly after the accident, but he still suffered from back pain. *Id.* A December 2009 MRI[3] showed "disc degenerative changes at L5-S1 and central disc protrusions lateralizing to the right at L5-S1 with mild canal stenosis." *Id.* Dr. Delbridge concurred with neurosurgery that surgery would not improve Thomas's pain, opining that there was "nothing really definite regarding his back that surgery would materially improve" and that Thomas's large size would make operating difficult. *Id.* Dr. Delbridge concluded that as a result of his back injury, Thomas could not lift more than twenty pounds on a

---

[2] Thomas reported in his disability applications that his employment at the furniture rental company ended in November 2010, but he had no earnings from the company in 2010, so he appears to have gotten his years mixed up (he also reported he last worked in May 2010, when his part-time counseling employment ended).

[3] Magnetic Resonance Imaging.

repetitive basis, and he could never lift from the floor level (only from knee level). AR 676. Dr. Delbridge also found Thomas could not repetitively twist, turn, or climb ladders. *Id.* Dr. Delbridge did not impose any limitations related to sitting and standing, despite Thomas's statement that his back hurt if he sat or stood for "too long." AR 675-76.

Thomas was in a second car accident on December 31, 2010. AR 678-79. After the accident, he complained of neck pain, right shoulder pain with numbness radiating down his right arm to his fingertips, and low back pain radiating to his left leg. AR 679. June and October 2011 neck MRIs were normal, while a June 2011 lumbar spine MRI "showed epidural lipomatosis[4] beginning at L4 extending inferiorly into the sacrum," causing "moderate spinal narrowing at L5-S1 and at the sacrum." AR 679, 686-87, 691-92. Thomas visited Dr. Delbridge for a second consultative examination in August 2011, who reaffirmed his prior limitations and imposed additional limitations related to Thomas's right shoulder (no reaching above shoulder level or repetitively reaching far away from his body with the right arm). AR 678-81. After Dr. Delbridge's examination, Thomas underwent physical therapy for his back and neck. AR 726.

Thomas filed a prior application for DI benefits in March 2011, alleging disability since December 2009 (after his employment with the furniture rental company ended). AR 2547. Thomas claimed that he suffered from chronic pain in his right shoulder and back as a result of the two car accidents and that he had to shift positions often, had

---

[4] "'Epidural lipomatosis is a rare disorder in which an abnormal amount of fat is deposited on or outside the lining of the spine. It may press on the spinal cord and nerves.' 'Symptoms vary, but back pain and weakness are the most common ones. Other possible signs may be a loss of sensation or reflexes that are too slow or too fast.' Steroid use and obesity are two possible contributors to the disorder." *Bruesch v. Colvin*, No. 3:12-cv-01453-HU, 2014 WL 287883, at *2 n.4 (D. Or. Jan. 23, 2014) (quoting *Epidural Lipomatosis*, Cedars Sinai, http://www.cedars-sinai.edu/Patients/Health-Conditions/ Epidural–Lipomatosis.aspx (last visited Aug. 30, 2013)), *aff'd,* 609 F. App'x 481 (9th Cir. 2015).

Case 6:20-cv-02088-LTS-KEM    Document 43    Filed 08/31/22    Page 3 of 23

difficulty concentrating, and had developed depression and anxiety because of his pain. AR 2551. An ALJ denied Thomas's DI application on February 15, 2013, finding Thomas could perform light work (including sitting and standing for six hours in an eight-hour workday). AR 2547-58. The ALJ relied on Thomas's relatively normal activities of daily living and sparse treatment even once he obtained health insurance in mid-2011 (in 2011, four visits to the primary care provider for back and other pain; in 2012, three visits for back and other pain; and mental-health treatment beginning in January 2012). AR 2952-55; *see also* AR 402-07, 428, 460-64. The Appeals Council denied review in May 2014. AR 2564.

Throughout 2013 and 2014, Thomas continued regular therapy with Joyce Andresen, LISW (Therapist Andresen), and attended psychiatric medication-management appointments. Thomas saw Ann Rathe, MD, for his mental-health prescriptions until June 2013, when he transferred care to nurse practitioner Vicki Boling (NP Boling) at the same practice. AR 494-605. In 2013, he sought treatment for physical ailments only three times, all at the office of his primary care provider; he complained of pain (in his back, neck, right shoulder, and feet) and numbness and tingling (in his right arm, legs, and feet). AR 411-27. During the first five months of 2014, he visited his primary care provider once (in February), complaining of back and neck pain radiating into his arms. AR 432-37. At his next appointment in June 2014, he complained of pain in his low back, neck, wrists, ankles, and feet. AR 411-414. He was referred to podiatrist Ronald Kane, who ultimately performed surgery on Thomas's right ankle in August 2014. AR 309-366.

After undergoing surgery, Thomas once again filed for DI benefits (one of the current applications) in September 2014, alleging disability since February 2013 (after the prior denial); he later added a claim for SSI benefits covering the same time period and amended the onset date to September 2014 (after his ankle surgery). *See* Doc. 22.

The Social Security Administration denied Thomas's applications on initial review in November 2014 and reconsideration in December 2014. AR 58-86.

At an appointment with his primary care provider in September 2014, Thomas complained of back, leg, and neck pain radiating down his arms to his fingers, and he underwent physical therapy for neck pain and cervical radiculopathy in October and November. AR 419-22; Doc. 22. He also met with a nutritionist to discuss his diabetes and obesity during the fall of 2014. AR 456-57, 871-72.

Thomas's pain treatment in 2015, 2016, and the first half of 2017 primarily consisted of visits to Dr. Kane at the podiatry clinic and to his primary care provider, where he complained of back, left leg, and right ankle pain (after undergoing physical therapy in 2014, he did not complain of neck, shoulder, and arm pain during this time). AR 871-901, 1025-1026. In addition, Thomas participated in physical therapy for his back in early 2015. Doc. 22. He received a back MRI in July 2016, prior to visiting Ashar Afzal, MD, at the pain clinic. AR 612-13, 627-28. Dr. Afzal noted the MRI was "significant for severe epidural lipomatosis that actually results in severe central stenosis at multiple levels," as well as showing facet arthropathy, degenerative spondylosis, and degenerative disc disease, with spinal narrowing up to at least L3. *Id.* According to Dr. Afzal, epidural lipomatosis caused most of the compression on Thomas's spinal canal. *Id.* Dr. Afzal found that degenerative spondylosis and facet arthropathy were not contributing to Thomas's radicular symptoms and neuropathic pain and that these symptoms would not improve until Thomas lost weight. *Id.* Dr. Afzal said that steroid injections would make lipomatosis worse and that epidural lipomatosis could not be corrected with surgery; thus, Dr. Afzal said he did not "have anything to offer [Thomas]." *Id.* Dr. Afzal referred Thomas to the diabetes and endocrinology clinic to see if there were medical reasons for his obesity. *Id.* Beginning in August 2016, Thomas began visiting the clinic regularly, meeting with physician assistant Linsey High (PA High) to review his food diary and blood sugar readings (Thomas never checked his blood

5

sugars as often as requested, stating he was afraid of needles). AR 983-1014, 1268-1306, 2364-2503.

An ALJ (not ALJ Larner) held a hearing on Thomas's disability applications in March 2017. At that time, the medical opinions in the record included a March 2015 joint mental RFC opinion from NP Boling and Therapist Andresen (AR 902); and April 2015 and June 2016 opinions from Dr. Kane that Thomas's ability to walk was "severely limited" such that he qualified for handicapped parking (AR 904-05). The ALJ cut the hearing short to refer Thomas to two consultative examinations: a psychological examination with Christine Guevara, PhD (AR 1127-31), and a physical examination with Danielle Davenport, MD (AR 1137-41). After receiving the consultative examiners' opinions, the ALJ held a second hearing in August 2017. AR 27-39. The ALJ denied Thomas's DI and SSI applications in September 2017. AR 10-20. The ALJ limited Thomas to sedentary work that allowed him to shift positions at will and found that he would be off task up to 8% of the time (in addition to other limitations). AR 15. Nevertheless, the ALJ found jobs existed that Thomas could perform. AR 20.

The Appeals Council denied Thomas's request for review in April 2018 (AR 1-3), and Thomas filed a new disability application a month later. AR 1-3, 1366. After denials at the initial and reconsideration levels, ALJ Larner (a different ALJ than the ALJ who presided over Thomas's 2017 hearings) held a hearing and denied Thomas's disability application in August 2019. AR 2743-56. The ALJ included fewer limitations in Thomas's RFC than the previous ALJ, finding Thomas could perform light work that required being on his feet for less than two hours of the day and that involved simple, routine tasks (as well as other limitations); he did not include a limitation related to being off task. AR 2748.

Meanwhile, Thomas had appealed the 2017 ALJ decision to this court, and in September 2019, the court reversed and remanded the case to the Social Security Administration. AR 2623-39. The court rejected Thomas's arguments that the ALJ erred

6

in discounting the psychological consultative examiner's opinion and NP Boling and Therapist Andresen's joint opinion, finding that substantial evidence (including the relatively normal mental status examinations) supported Thomas's mental RFC (no social functioning limitations; able to concentrate for simple, routine work with no strict production quotas and that allowed him to be off task up to 8% of the time). *Id.* The court found, however, that it was not clear from the VE testimony whether jobs existed for someone who would be off task 8% of the time (as the ALJ had found). *Id.* The VE had testified that jobs existed for someone who would be off task 10% of the time; but the VE had also testified that no jobs existed for someone who needed an additional five-minute break every hour. *Id.* The court found this testimony conflicted, since being off task 10% of the time equated to a six-minute break every hour. *Id.* Thus, the court held that without an explanation to resolve the conflict, the VE testimony did not support the ALJ's step-five finding "that there are jobs in the national economy that Thomas could perform." *Id.* Thus, the court reversed the Commissioner's decision and remanded the matter to the Commissioner for further proceedings consistent with the court's opinion. *Id.*

At the time this court remanded the 2017 ALJ decision, Thomas's appeal of the 2019 ALJ decision was pending before the Appeals Council. Thus, the Appeals Council consolidated Thomas's disability applications, vacated both the 2017 and 2019 ALJ decisions, and remanded to an ALJ for a hearing and "further proceedings consistent with the order of the court." AR 2643-44.

Additional treatment records covering the latter half of 2017 through early 2020 showed that Thomas continued to attend weight-management appointments with PA High, therapy with Therapist Andresen, and psychiatric medication-management appointments (in June 2019, Thomas transferred care from NP Boling to nurse practitioner Nicole Delagardelle (NP Delagardelle) at the same practice). Doc. 22. Thomas also continued to seek treatment from Dr. Kane for right ankle pain and from

his primary care provider for back pain radiating into his left leg. *Id.*; *see also* AR 1908. In July 2019, Thomas requested a back MRI, as he was newly experiencing pain at rest. Doc. 22. A July 2019 MRI showed no changes since July 2016. *Id.* In September 2019, his primary care provider referred Thomas to neurosurgery, as his back pain had recently begun radiating into his right thigh. Doc. 22. The neurosurgeon noted Thomas's July 2019 MRI was unremarkable and recommended he see pain clinic doctors for conservative pain management. *Id.*

Thomas also began complaining about right shoulder pain and arm tingling and numbness to his primary care provider in October 2017. *Id.* He underwent physical therapy for his right shoulder in May and June 2018, and when his pain continued, he was referred to an orthopedic doctor, Gary Knudson, MD. Doc. 22. A May 2018 EMG[5] showed mild carpal tunnel syndrome in Thomas's right wrist, and a July 2018 arthogram showed a focal anterior labral tear in Thomas's right shoulder. *Id.* When Thomas met with Dr. Knudson in August 2018, he received a cortisone injection to his shoulder, which improved his pain. *Id.* He received another cortisone injection in May 2019 and did not otherwise complain of right shoulder pain. *Id.* In June 2019, he complained of left wrist pain to his primary care provider. *Id.* She declined to order an EMG since Thomas had opted for conservative treatment with regard to the carpal tunnel syndrome in his right wrist. *Id.* Thomas began complaining of right knee pain in December 2019 (to his primary care provider). *Id.* He began aquatherapy in January 2020, which he reported improved his pain. *Id.*

Thomas's case was assigned to ALJ Larner, the same ALJ who had issued the 2019 decision. In early June 2020, the ALJ held a hearing. AR 2517-43. On June 30, 2020, the ALJ issued a written decision following the familiar five-step process outlined

---

[5] Electromyography.

in the regulations[6] finding Thomas not disabled from September 24, 2014, through the date of the decision. AR 1310-26. The ALJ found Thomas suffered from the following severe impairments: diabetes with neuropathy, degenerative disk disease of the lumbar spine, mild right carpal tunnel syndrome, osteoarthritis of the shoulder, obesity, depression, anxiety, and post-traumatic stress disorder (PTSD). AR 1312. The ALJ's RFC[7] determination mirrored his RFC determination from 2019, except for an additional reaching limitation:

> [Thomas] has the [RFC] to perform light work . . . except: with the ability to stand/walk 2/8 hours; the ability to occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; but never climb ladders, ropes, or scaffolds; the ability to frequently handle and finger with the right upper extremity; the ability to occasionally reach overhead with the right upper extremity; and is limited to simple, routine tasks with occasional interaction with co-workers, supervisors, and the public.

AR 1315, 1341.[8] Relying on VE testimony, the ALJ found that Thomas could not perform his past relevant work, but that a significant number of other jobs existed in the national economy that Thomas could perform, such as assembler, bench assembler, and

---

[6] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. §§ 404.1520(a)(4), 416.920**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

[7] RFC means "the most that a claimant can do despite her limitations." *Sloan v. Saul*, 933 F.3d 946, 949 (8th Cir. 2019) (citing **20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1)**).

[8] The limitation to light work includes the ability to lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." **20 C.F.R. §§ 404.1567(b), 416.967(b)**. "Frequently" is a term of art meaning from one-third to two-thirds of an eight-hour day. *See, e.g.*, *Dictionary of Occupational Titles (DOT)*, **App. C**. "Occasionally" means "very little up to one-third" (or two hours) of an eight-hour workday. *See id.*; **SSR 96-9p, 61 Fed. Reg. 34478, 34480** (July 2, 1996).

9

clerical addresser. AR 1326. Accordingly, the ALJ concluded that Thomas was not disabled. *Id.*

Because Thomas did not file objections to the Appeals Council, the ALJ's decision on remand became final when the Appeals Council did not assume jurisdiction within sixty days of the ALJ's decision.[9] Thomas filed a timely complaint in this court seeking judicial review of the Commissioner's decision (Docs. 1, 3).[10] The parties briefed the issues (Docs. 22-23, 26, 34, 37, 42), and the Honorable Leonard T. Strand, Chief United States District Judge for the Northern District of Iowa, referred this case to me for a report and recommendation.

## II. DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole."[11] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[12] The court "do[es] not reweigh the evidence or review the factual record de novo."[13] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[14]

---

[9] *See* **20 C.F.R. §§ 404.984(c)-(d), 416.1484(c)-(d)**.

[10] *See* ***Walker-Butler v. Berryhill***, 857 F.3d 1, 3-4 (1st Cir. 2017) (interpreting **42 U.S.C. § 405(g)** and **20 C.F.R. § 422.210(c)**).

[11] ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**.

[12] ***Kirby***, 500 F.3d at 707.

[13] ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994).

[14] ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

Thomas argues that the ALJ violated the law-of-the-case doctrine by formulating an RFC that included fewer limitations than the previous ALJ in 2017. Thomas also argues that the ALJ erred in failing to fully credit Thomas's subjective complaints and rejecting the medical-opinion evidence without further developing the record. Finally, Thomas challenges the ALJ's appointment to that position under the Appointments Clause of the United States Constitution.

### A. Law of the Case

Thomas argues the ALJ's RFC should have included a finding that Thomas would be off-task 8% of the time, as found by the original ALJ in 2017.[15] At the very least, Thomas argues the ALJ should have specifically explained why he was not including such a limitation under the law-of-the-case doctrine.

"The law of the case doctrine prevents the relitigation of a settled issue in a case and requires courts to adhere to decisions made in earlier proceedings in order to ensure uniformity of decisions, protect the expectations of the parties, and promote judicial economy."[16] Generally speaking, "[t]he doctrine applies to appellate decisions, as well as to final decisions by the district court that have not been appealed," but "[i]t does not apply to interlocutory orders, . . . 'for they can always be reconsidered and modified by a district court prior to entry of a final judgment.'"[17]

The Eighth Circuit has recognized that the law-of-the-case doctrine applies to administrative agencies like the Social Security Administration on remand from federal

---

[15] Thomas does not argue that the ALJ on remand should have included other limitations found by the original ALJ, such as the lifting restrictions of sedentary work or allowing Thomas to shift positions at will.

[16] *United States v. Bartsh*, 69 F.3d 864, 866 (8th Cir. 1995).

[17] *First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*, 477 F.3d 616, 620 (8th Cir. 2007) (quoting *United States v. Hively*, 437 F.3d 752, 766 (8th Cir. 2006)).

court.[18]  "Thus, [the Social Security Administration] is bound by any finding that a district court renders prior to remanding a case for further consideration."[19]  This includes any "issue[] actually decided, either implicitly or explicitly . . . ."[20]  The Eighth Circuit has recognized that the ALJ on remand is not necessarily bound by the original ALJ's findings, however.[21]

Here, in the prior appeal, the district court held the VE contradicted himself when the VE essentially testified that jobs existed for someone who was off task 10% of the time but not for someone who was off task a little more than 8% of the time.  AR 2632.  Because the ALJ had found Thomas would be off task 8% of the time, the district court noted "confusion on whether" Thomas could "engage in the jobs listed" by the ALJ.  AR 2633.  The court concluded the VE's conflicting testimony, "without explanation, cannot support the ALJ's step-five determination that there are jobs in the national economy that Thomas could perform."  *Id.*  The court reversed the ALJ's decision and "remanded to the Commissioner for further proceedings consistent with this opinion."  AR 2639.

Here, the law-of-the-case doctrine did not prevent the ALJ on remand from discarding the 8% off-task limitation.  The district court did not explicitly direct the Social Security Administration on remand to obtain additional testimony from a VE or to resolve

---

[18] *Brachtel v. Apfel*, 132 F.3d 417, 419-20 (8th Cir. 1997).

[19] *Aguiniga v. Colvin*, 833 F.3d 896, 901 (8th Cir. 2016).

[20] *United States v. Bates*, 614 F.3d 490, 494 (8th Cir. 2010).

[21] *Steahr v. Apfel*, 151 F.3d 1124, 1125-26 (8th Cir. 1998) (affirming district court's holding that law-of-the-case doctrine did not prevent second ALJ from finding claimant could perform her past work, contrary to first ALJ, when district court's reason for remand had nothing to do with this issue; the court deferred to district court's interpretation of its own mandate order); *see also* **Crum v. Colvin**, No. C14-4055-MWB, 2015 WL 5084325, at *5 (N.D. Iowa Aug. 27, 2015) (adopting report and recommendation) ("When subsequent proceedings follow a general remand, the ALJ may properly decide anything not foreclosed by the mandate.").

12

the conflict.[22]  And the court's analysis of the issue focused on whether a conflict existed in the VE's testimony, not whether the off-task limitation was supported by the treatment records and other evidence.  I do not find that the district court held, either explicitly or implicitly, that Thomas's RFC must include a limitation to being off task 8% of the time.  And the prior ALJ's decision did not settle any issues such that the law-of-the-case doctrine applies, since Thomas appealed and on remand, the Appeals Council vacated the decision.[23]

The Eighth Circuit's opinion in *Aguiniga v. Colvin* is most analogous.  In that case, the original ALJ awarded benefits based on an onset date of April 2009.[24]  The claimant appealed to federal court, arguing that the ALJ should have considered her motion to reopen a prior application and awarded benefits based on an onset date of September 2007 instead.[25]  The Commissioner did not resist remand, and the district court entered an order "direct[ing] the Appeals Council to remand the case to the ALJ to issue a new decision and consider the entire relevant period."[26]  On remand, the Appeals Council vacated the original ALJ's decision, and after a hearing, a new ALJ found that the claimant was not disabled during the entire relevant time period—from September 2007 through 2013.[27]  The Eighth Circuit rejected the claimant's argument that the law-

---

[22] This fact renders the case Thomas relies on, *Meyerhoff v. Colvin*, No. C 12-3046-MWB, 2013 WL 3283696, at *1-2, *14-15, *18 (N.D. Iowa June 28, 2013) (adopting report and recommendation), distinguishable—in that case, the district court's remand order explicitly directed the ALJ to obtain additional evidence on a particular issue (rather than generally remanding for further proceedings).

[23] *Aguiniga*, 833 F.3d at 901 (noting that "nothing in this case was settled fact or law given the Appeals Council's vacation of the original opinion of the ALJ").

[24] *Id.* at 899.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 899-900.

13

of-the-case doctrine limited the ALJ on remand to addressing the time period from September 2007 to April 2009.[28]  The Eighth Circuit noted the district court's order directed the ALJ to address the entire relevant period and issue a new decision, which is exactly what the ALJ had done.[29]  Thus, the court rejected the claimant's argument that the law-of-the-case doctrine required a finding of disability after April 2009.[30]

Here, nothing about Thomas's RFC was settled such that the ALJ could not formulate a new RFC on remand.  And indeed, the ALJ largely adopted the RFC from his prior vacated decision in 2019 (rather than the RFC from the original ALJ's prior vacated decision in 2017).  The ALJ noted that Thomas's mental-health symptoms have been stable:  mental status examinations were mostly normal; he rarely complained of issues concentrating or paying attention to providers; and he has remained on largely the same psychiatric medications throughout the entire relevant period (150 milligrams of trazodone and 60 to 120 milligrams of Cymbalta or its generic).  *See* Doc. 22; AR 531, 560, 939, 978, 2288, 1798.  The nature of the substantial-evidence standard is such that two different ALJs could formulate different RFCs and both be supported by substantial evidence.  Here, substantial evidence supports the ALJ's failure to include the off-task limitation, and no further explanation was required.

I recommend rejecting Thomas's argument that the law-of-the-case doctrine required the ALJ to find Thomas would be off task 8% of the time.

### B. Subjective Complaints

When evaluating the credibility of a claimant's subjective complaints—including pain or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*:

---

[28] *Id.*

[29] *Id.* at 901.

[30] *Id.*

"(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."[31] "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."[32] The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest his credibility finding on "objective medical evidence to the contrary"[33] or "inconsistencies in the record as a whole."[34] Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'"[35]

Thomas testified at the hearing in June 2020 that due to back pain, he can sit for only five to ten minutes at a time before needing to shift positions and that he spends 75% to 80% of the day lying down. AR 2529-30, 2532; *see also* AR 242. He estimated that he could walk half a block before needing to sit down. AR 2531. He reported doing household chores (cooking, cleaning, mowing the lawn) in short spurts with breaks. AR 2537.

The ALJ recognized that Thomas suffers back pain but found it does not limit him as severely as he testified, finding Thomas could sit for six hours and stand or walk for two hours in an eight-hour day without the need to shift positions at will. AR 1315. The treatment records reflect that Thomas complained of difficulties sitting for long periods. *See* AR 461, 464 (November 2012: reporting that he did not think he could sit at a job

---

[31] *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998); *accord Jones v. Callahan*, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*, 804 F.2d 456 (8th Cir. 1986).

[32] *Black*, 143 F.3d at 386.

[33] *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002).

[34] *Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir. 1993).

[35] *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (quoting *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001)).

for very long and that it hurts to sit for any length of time); AR 764 (October 2014: reporting at physical therapy that he was "able to [sit] with much difficulty"); AR 626 (March 2015: noting that Thomas was "progressing" on physical-therapy goal of being able to sit for forty-five minutes without needing to rise but that he still suffered radicular symptoms with sitting); AR 1062 (June 2016: complaining of radicular symptoms in legs to primary care provider, noting he "could be just 'sitting' and feels left leg numbness," which lasts five to ten minutes, sometimes longer); AR 627 (July 2016: reporting to pain clinic doctor that pain makes it difficult to sit); AR 1139 (April 2017: reporting to consultative examiner that his left leg goes numb when sitting); AR 2210 (July 2018: requesting to be excused from jury duty due to being unable to sit in an upright position for long periods of time without having pain radiate down his leg); AR 1875 (September 2019: reporting back pain with radiating tingling and numbness that worsened with long periods of sitting). But these treatment records do not necessarily support that Thomas could only sit for ten minutes at a time, as Thomas testified. And as the ALJ noted, some of Thomas's activities of daily living are inconsistent with an inability to sit for more than ten minutes at a time. Thomas reported driving his parents to and from doctor's appointments, including appointments at the Mayo Clinic, roughly two hours away. AR 245, 519, 521, 957, 1758, 1763, 3022; *see also* AR 1139. He was able to travel with his parents to St. Louis (roughly five hours away from where he lives) to visit his uncle. AR 1750. Thomas also reported going out to dinner with his uncle in October 2012 and using the computer for an hour every day in February 2014; although outside the relevant time period, his symptoms have remained largely unchanged since that time. AR 433, 512. And NP Boling and Therapist Andresen submitted an opinion letter noting they had observed Thomas had difficulties moving from a sitting to standing position; but they made no mention of having observed difficulties sitting, despite appointments lasting anywhere from twenty minutes to an hour. AR 902.

16

Indeed, the ALJ generally considered Thomas's relatively normal activities of daily living. AR 1319, 1324. Thomas reported in function reports in 2014 and 2018 that he watches television and sports; mows the lawn over several days, taking breaks; does laundry; prepares meals; and shops for groceries at least once a week. AR 246-49, 3023-25; *see also* AR 456, 630, 902, 1139, 1852, 2424. Relatedly, he also reported doing yard work in June 2014 (noting he has difficulties catching his breath due to allergies on hot days); as well as making the bed, vacuuming, and performing yard work in September 2018, although he stated these activities caused pain. AR 414, 3059. He repeatedly told providers that he lives with his elderly parents with physical impairments of their own and helps care for them, run errands, and generally help out around the house. Doc. 22; AR 461, 521, 530, 539, 570, 558, 917, 1771; Doc. 22. The ALJ also noted Thomas spent time with his toddler nephew. AR 937, 947, 961, 1252, 1750, 2285. And Thomas reported volunteering at his church in April 2015. AR 917. The ALJ could find that Thomas's minimal limits in his activities of daily living were inconsistent with his allegations of disabling pain (and particularly, that his activities of daily living were inconsistent with an inability to sit for more than ten minutes at a time).[36]

The ALJ also noted Thomas's preoccupation with obtaining disability benefits. AR 1320. Thomas first filed for disability benefits within a few months of his second car accident; when that application was denied, he refiled within a few months of the Appeals Council's denial of review; and when the Appeals Council denied review of that application (which was ultimately reversed on appeal to this court), he refiled again. The mental-health records reflect that Thomas often expressed frustration that he still had not been granted disability, and his lawyer told him that he had a good case. *See* Doc. 22; AR 2264, 2303. In addition, they show that Thomas's lawyer encouraged him not to work, as it would affect his chances of obtaining disability: in 2012, Thomas told his

---

[36] *See Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005).

therapist that his lawyer said he had to wait until after the disability hearing to try and work; in early September 2014 (just before his alleged onset date here), Thomas's therapist noted he was contemplating looking for a part-time job, and Thomas said he would talk to his lawyer about the possibility of working part-time while he tried to obtain disability; and in September 2019, Thomas said he could not work until he was approved for disability. AR 499, 589-90, 1808; *see also* AR 2204 (Thomas's therapist encouraged him to think about jobs he could do since he continually gets turned down for disability). Thomas argues this evidence simply shows that he was disabled and that he wanted the benefits he was rightfully owed, but the ALJ could consider this evidence as "rais[ing] some questions as to whether [Thomas's] current unemployment [wa]s truly the result of medical problems," or whether Thomas had other motivations for not working.[37]

Thomas takes issue with the ALJ's consideration of his relatively conservative treatment. Thomas consulted with neurosurgeons and pain clinic providers several times over the years, but they opined that his problems were not surgical and would not be improved with injections. Doc. 22. Throughout the entire relevant time period, Thomas remained on largely the same medications to control his back pain: gabapentin (with occasional adjustments to the dosage); Cymbalta; and beginning in January 2015, meloxicam (an anti-inflammatory) and tizanidine (a muscle relaxer). *See* Doc. 22; AR 899-900, 1891. Thomas's podiatrist also prescribed narcotics (despite his primary care provider routinely telling Thomas that narcotics were not recommended for chronic pain): hydrocodone-acetaminophen through 2015 and tramadol beginning in January 2016. *See* AR 319, 1017-19, 1023-24, 1247, 1865, 2318. His primary care provider offered several times to change Thomas's gabapentin prescription to Lyrica (pregabalin) to see if it better

---

[37] *Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

18

controlled nerve pain, but Thomas declined. Doc. 22; AR 2324; *see also* AR 1070. The ALJ could consider Thomas's relatively stable symptoms and treatment.

Thomas also argues that the ALJ erred in evaluating the MRIs of his lumbar spine.[38] The ALJ described the July 2016 MRI as showing "mild-to-moderate abnormalities" with "no evidence of a disc herniation, severe stenosis, or spondylolisthesis." AR 1316. The ALJ noted the July 2019 MRI "showed stable findings; no disc herniation; probable bilateral nonacute L5 spondylolysis without spondylolisthesis[;] unchanged mild L5-S1 level degenerative disc disease and spondylosis; and epidural lipomatosis." AR 1317. Thomas argues that the ALJ should have acknowledged Dr. Afzal's review of the July 2016 MRI, which he opined showed "severe central stenosis" (narrowing) "at multiple levels," worst at L5, as a result of lipomatosis, with spinal canal narrowing up to L3 at least. AR 628. Dr. Afzal noted that the "significant compression" caused by lipomatosis was probably causing Thomas's radicular symptoms. *Id.*

Other doctors found Thomas's MRI findings less severe. The July 2016 radiologist found arthropathy at L5-S1 with moderate transverse narrowing and mild subarticular zone narrowing; disc desiccation at L5-S1 without remarkable narrowing; and no narrowing at higher levels. AR 612. The radiologist acknowledged that the dural sac had a Y configuration at L5-S1 due to abundant fat. *Id.* The July 2019 radiologist noted unchanged findings since the July 2016 MRI, showing mild arthropathy and disc desiccation at L5-S1 and negative findings at higher levels. AR 1921-22. The radiologist noted "[a]bundant epidural lumbosacral spine fat" but stated "[t]his finding is usually . . . of no clinical significance." *Id.* When Dr. Oya, a neurosurgeon, reviewed the MRI in November 2019, he noted it showed loss of disc height and degenerative disc disease but

---

[38] Contrary to Thomas's argument otherwise, the ALJ discussed treatment records from prior to November 2019 related to Thomas's back pain. *See* AR 1316-18.

found there was "no significant canal stenosis or foraminal narrowing" and concluded the MRI was unremarkable (I note that Dr. Oya reviewed the MRI with an eye for surgery, as opposed to pain management like Dr. Afzal). AR 3132.

Although it would have been better for the ALJ to address Dr. Afzal's contrary interpretation, I cannot say that the ALJ erred in finding the MRIs showed (at most) moderate abnormalities. The ALJ's description of the MRIs is consistent with three of the four doctors who reviewed the MRIs.[39] As the Seventh Circuit has held under similar circumstances, "[e]ven if the various readings [of the MRI] are mutually exclusive, and even if the ALJ gave more weight to one over the other," it is not for the court to reweigh the evidence.[40] Substantial evidence supports the ALJ's determination that the MRI showed no more than moderate abnormalities.[41]

It is clear that Thomas suffers pain and is limited by that pain. But the ALJ could consider Thomas's treatment history and activities of daily living in deciding not to fully credit Thomas's subjective complaints. I recommend finding that substantial evidence supports the ALJ's determination that Thomas is less limited than he alleged.

### C. Medical-Opinion Evidence

Thomas argues the ALJ impermissibly "played doctor" by rejecting the only medical opinion in the record on his physical limitations from an examining source, Dr. Davenport, during the relevant time period. AR 1137-41, 1322. Thomas argues that

---

[39] In addition, the ALJ's description is consistent with Dr. Delbridge's interpretation of the June 2011 MRI, which "showed epidural lipomatosis beginning at L4 extending inferiorly into the sacrum," causing "moderate spinal narrowing at L5-S1 and at the sacrum." AR 679.

[40] *Gedatus v. Saul*, 994 F.3d 893, 901-02 (7th Cir. 2021) (rejecting argument that ALJ erred in describing MRI as "normal" when the radiologist and two treating doctors opined the MRI was normal, but at least one other treating doctor thought the MRI had been misread and showed abnormalities).

[41] *Id.*

after finding the opinion "vague" and inconsistent with the record, the ALJ should have either obtained additional opinion evidence from a treating or examining source or sought clarification from Dr. Davenport.

Thomas relies on cases holding that "[RFC] is a medical question" that must be supported by "[s]ome medical evidence."[42]  But although Dr. Davenport issued the only medical opinion in the record from an *examining* source (Thomas's primary care provider refused to complete disability paperwork (AR 2199)), the record contained other medical opinions.  Specifically, the ALJ assigned significant weight to the medical opinions of the state agency consultants who issued opinions in June and October 2018 based on their review of the treatment records.  AR 1321, 2713-15, 2731-34; *see also* AR 64-67, 80-82.  The ALJ may rely on nonexamining medical opinions when more consistent with the ALJ's review of the treatment records and other evidence of record.[43]

---

[42] *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001); *accord Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017); *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007); *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).

[43] *See Bowers v. Kijakazi*, 40 F.4th 872, 875-76 (8th Cir. 2022) (holding that ALJ did not err in relying on opinions of state agency physicians, who examined only the medical records and not the claimant, when their opinions that claimant could perform light work were more consistent with the objective medical evidence than the treating doctor's opinion; the objective medical evidence showed routine treatment every six months, mostly mild findings on imaging, and normal motor and neurological function); *see also Kamann v. Colvin*, 721 F.3d 945, 948-51 (8th Cir. 2013) (rejecting claimant's argument that the ALJ "formulated his own medical opinion" when the ALJ rejected the RFC opinion of the one-time examining psychologist and instead relied on a "thorough[] review[] [of] years of medical evidence on record" to formulate an opinion "consistent with the views of . . . the reviewing agency psychologist").  In addition, here, Thomas's physical condition has largely remained stable throughout the relevant time period (especially his back), unlike in one of the cases relied upon by Thomas.  *See Noerper v. Saul*, 964 F.3d 738, 743-44, 746-47 (8th Cir. 2020) (holding that ALJ failed to develop the medical-opinion evidence when the ALJ relied on the claimant's primary care provider's characterization of her knee impairment, reflected in his treatment records, without resolving the differences in opinion reflected in the claimant's orthopedist's treatment records; and although the state agency consultant, like the ALJ, had found the claimant could be on her feet for six hours in an eight-hour day, this opinion "predated the majority of the treatment records concerning [the claimant's] knee conditions").

Thomas also cites cases recognizing that the ALJ has a duty "to develop the record fairly and fully."[44] But while the ALJ may be under an obligation to contact an examining source in certain instances,[45] no such duty exists merely because the ALJ finds the source's opined limitations vague.[46] I recommend rejecting Thomas's argument that the ALJ should have further developed the record.

### D. Appointments Clause

After briefing in this case was completed, I permitted Thomas to raise an Appointments Clause challenge via supplemental briefing, noting that the Government could raise its forfeiture argument in response. Doc. 29. Thomas's counsel filed almost identical supplemental briefs in several cases, arguing that Nancy Berryhill's service as Acting Commissioner violated the Federal Vacancies Reform Act (FVRA) and the Appointments Clause of the United States Constitution and that therefore her ratification of the ALJ's appointment in this case was invalid. I recently rejected all of Thomas's arguments in a thorough order (and declined to address the Government's forfeiture

---

[44] *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004).

[45] *See Vossen v. Astrue*, 612 F.3d 1011, 1016-17 (8th Cir. 2010) (holding that when ALJ rejected consultative examiner's sitting and standing limitations as unauthentic, the ALJ should have further developed the record regarding the opinion's authenticity); *Snead*, 360 F.3d at 837-39 (holding that when the claimant had been hospitalized twice for congestive heart failure and his doctor provided a letter that his underlying heart condition rendered him disabled, the ALJ erred in concluding "no clinical documentation" supported that the claimant's heart condition would cause symptoms lasting for twelve months, as the record contained no evidence contradicting the doctor's opinion on the claimant's heart condition and the ALJ erred in failing to develop the record further on the claimant's heart condition).

[46] *Vossen*, 612 F.3d at 1016 (noting that ALJ does not have a duty to develop the record simply because a treating source's opinions "were unclear or lacked foundation"); *cf. Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (holding that the ALJ may discount a treating source's opinion "when it consists of nothing more than vague, conclusory statements" (cleaned up) (quoting *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996))).

argument).[47]  I recommend that the district court adopt my prior reasoning and reject Thomas's challenge to the ALJ's appointment in this case.

## III.  CONCLUSION

I recommend **affirming** the Commissioner's decision.  Judgment should enter in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).  Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. **Fed. R. Civ. P. 72**.  Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.  *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DATED** August 31, 2022.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[47] ***Bauer v. Kijakazi***, No. 21-CV-2008-KEM, 2022 WL 2918917 (N.D. Iowa July 25, 2022).